UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JENNIFER L. WELSH ex rel.                                    PLAINTIFF
THE ESTATE OF JANET GREEN

V.                                    CIVIL ACTION NO. 3:25-CV-298-KHJ-MTP

CHARLES SCHWAB & CO., INC., et al.                          DEFENDANTS

ORDER

Before the Court is Defendant Charles Schwab & Co., Inc.'s [5] Motion to Compel Arbitration. For the reasons stated below, the Court denies the motion without prejudice, and it will set this matter for a bench trial to determine whether an arbitration agreement exists. *See* 9 U.S.C. § 4; *Chester v. DirecTV, L.L.C.*, 607 F. App'x 362, 363–65, 365 n.5 (5th Cir. 2015) (per curiam).

I.      Background

This case arises from alleged new account fraud involving two online brokerage accounts. Compl. [1] ¶¶ 9–15. Plaintiff Jennifer L. Welsh asserts that TD Ameritrade and its successor in interest, Schwab, negligently allowed her brother to fraudulently open two accounts in their mother's name. *Id.* ¶¶ 17–18. In 2014 and 2016, respectively, Welsh's mother—Janet Green—purportedly opened two TD Ameritrade accounts online. *See id.* ¶¶ 9–10. But Welsh asserts that her brother—Robert Nuzum—posed as Green online and forged her electronic signature on the account agreements so he could convert over $660,000 in assets from her. *Id.* ¶¶ 9–15; Welsh Aff. [7-1] ¶ 12.

According to Welsh, she assumed primary responsibility for Green's care in 2004 because Green's other children lived out of state. [7-1] ¶ 2. By 2015, Green had lost the ability to manage her financial affairs, so she gave Welsh her power of attorney. [1] ¶ 12; [7-1] ¶ 13. In early 2016, Green moved into an assisted living home, and by 2018, Green had a dementia diagnosis. [7-1] ¶ 3; [1] ¶¶ 6, 12. From Green's entry into the assisted living home until her death in 2024, Welsh visited her several times per week and was familiar with her lifestyle. [7-1] ¶¶ 3, 5. Relevant here, Green never owned a computer or smartphone, and she never learned how to use one. *Id.* ¶ 8. Additionally, despite owning a flip phone for emergencies, Green preferred to use a landline for phone calls. *Id.*

After Green's death, Welsh became the executor of Green's estate and discovered the two TD Ameritrade brokerage accounts. *Id.* ¶¶ 6–7. In doing so, she allegedly found that over $660,000 in assets flowed from the second account— opened in 2016—to Nuzum during the years following Green's dementia diagnosis. *See* [1] ¶¶ 12–15. Moreover, both account agreements were electronically signed with Green's name, but they listed Green's email address and phone number as "RWNUZUM@COMCAST.NET" and "(504) 722-7863," respectively. Jennings Aff. [5-1] at 6–9, 24–27. So in April 2025, Welsh sued Schwab for negligence on behalf of Green's estate. *See* [1].

Schwab—which acquired TD Ameritrade in 2020—now seeks to enforce three arbitration provisions against Welsh. [5] at 2–4, 8. The first account, opened in 2014, closed before Schwab acquired TD Ameritrade. [5-1] at 2–3. So Schwab seeks

2

to enforce an arbitration provision included in the 2014 TD Ameritrade account agreement with respect to claims arising from the first account. *See* [5] at 7–8; *see also* [5-1] at 17–18. But the second account, opened in 2016, transitioned from TD Ameritrade to Schwab in 2023. [5-1] at 3. Since Green did not opt out of the transition, she purportedly agreed to Schwab's account agreement. *Id.* Thus, Schwab seeks to enforce arbitration provisions in the 2016 and 2023 agreements with respect to claims arising from the second account. *See* [5] at 4–5, 7–8; *see also* [5-1] at 35–36, 80–82. As for Welsh, she objects to arbitration, arguing that the agreements should not bind her because Green never signed them. Mem. Supp. Resp. [8] at 4–6.

II.   Standard

"The Federal Arbitration Act (FAA) applies to contracts involving interstate commerce that contain or are subject to a written agreement to arbitrate." *Grant v. Houser*, 469 F. App'x 310, 313 (5th Cir. 2012) (per curiam) (citing 9 U.S.C. §§ 1–2). The FAA applies to arbitration agreements in contracts that involve securities sales because they affect interstate commerce. *Id.*; *see, e.g.*, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 54–56 (1995). When an arbitration agreement falls under the FAA, courts consider a motion to compel arbitration in two steps. *Robinson v. J & K Admin. Mgmt. Servs., Inc.*, 817 F.3d 193, 195 (5th Cir. 2016). First, courts ask "whether [the] parties agreed to arbitrate and, second, whether [a] federal statute or policy renders the claims non[-]arbitrable." *Id.* (citation modified). To determine whether the parties agreed to arbitrate, courts "ask two [more]

3

questions: (i) whether there was a valid agreement to arbitrate between the parties, and if so, (ii) whether this dispute falls within the scope of that agreement." *Yanez v. Dish Network, L.L.C.*, 140 F.4th 626, 630 (5th Cir. 2025).

Courts "apply state contract law principles to determine if parties validly agreed to arbitrate a certain matter." *Id.* "The federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *IMA, Inc. v. Columbia Hosp. Med. City at Dall., Subsid. L.P.*, 1 F.4th 385, 391 (5th Cir. 2021) (citation modified). If a valid agreement exists, courts apply "the federal substantive law of arbitrability" to interpret the agreement's scope. *Graves v. BP Am., Inc.*, 568 F.3d 221, 222 (5th Cir. 2009) (per curiam) (citation modified). This requires courts to resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

III.    Analysis

The Court denies Schwab's [5] Motion without prejudice because Welsh has placed the "making of the arbitration agreement[s] . . . in issue . . . ." § 4. The Court first applies the choice-of-law provisions included in the 2014, 2016, and 2023 agreements. [5-1] at 18, 37, 117. So it evaluates the 2014 and 2016 agreements using Nebraska contract law, and it evaluates the 2023 agreement using California contract law. *See id.* Next, the Court finds that Welsh has produced enough evidence to place the "making of the arbitration agreement[s] . . . in issue" under

4

both Nebraska and California law. § 4. Thus, it will "proceed summarily to [a bench] trial" on whether an arbitration agreement exists. *Id.*

    A.  Choice of Law

Before proceeding to the merits, the Court addresses a threshold choice-of-law issue. Since courts consider an arbitration provision's validity using state substantive law, the Court must determine which state's law to apply to each provision. Federal courts sitting in diversity apply "federal procedural and evidentiary rules, and the substantive laws of the forum state." *Stringer v. Remington Arms Co.*, 52 F.4th 660, 661–62 (5th Cir. 2022) (citation modified). Under this framework, "the choice of law rules of the forum state determine which state's substantive law applies." *Jordan v. Evanston Ins.*, 23 F.4th 555, 560 (5th Cir. 2022) (citation modified).

The 2014 and 2016 agreements contain Nebraska choice-of-law provisions while the 2023 agreement contains a California choice-of-law provision. [5-1] at 18, 37, 117. Meanwhile, Schwab's briefing cites Fifth Circuit and Mississippi case law, *see* [5] at 5–8; Reply [10] at 2–3, and Welsh's briefing cites only one Fifth Circuit case. *See* [8] at 6. Neither party has addressed the applicable substantive law. *See* [5]; [8]; [10].

The Court could perhaps gloss over the issue because the parties have "an obligation to call the applicability of another forum's law to the court's attention in time to be properly considered." *Emps. Ins. of Wausau v. Occidental Petrol. Corp.*, 978 F.2d 1422, 1430 n.8 (5th Cir. 1992) (citation modified); *see Seifert v. United*

5

*Built Homes, LLC*, 684 F. Supp. 3d 555, 563 n.4 (N.D. Tex. 2023). But "[i]n Mississippi, when a contract includes an applicable law provision, 'the general rule is that courts will give effect to an express agreement that the laws of a specified jurisdiction shall govern.'" *JP&G LLC v. Voss*, 331 So. 3d 569, 575–76 (Miss. Ct. App. 2021) (alteration incorporated) (quoting *Cox v. Howard, Weil, Labouisse, Friedrichs Inc.*, 619 So. 2d 908, 911 (Miss. 1993) (en banc)); *see also Nethery v. CapitalSouth Partners Fund II, L.P.*, 257 So. 3d 270, 273–74 (Miss. 2018). And the Fifth Circuit has applied unquestioned choice-of-law provisions several times when determining the validity of arbitration agreements. *Edwards v. DoorDash, Inc.*, 888 F.3d 738, 745 (5th Cir. 2018); *In re Willis*, 944 F.3d 577, 580 n.4 (5th Cir. 2019); *Overstreet v. Contigroup Cos.*, 462 F.3d 409, 411–12 (5th Cir. 2006).[1] So the Court applies Nebraska law to the 2014 and 2016 agreements and California law to the 2023 agreement. *See Voss*, 331 So. 3d at 575–76.

B. Enforceability

The Court's analysis begins and ends with Welsh's challenge to the 2014, 2016, and 2023 arbitration provisions. Welsh challenges each provision for the same reason: forgery. [8] at 5–6 (citing *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003)). "A district court must hold a trial on the existence of an

---

[1] To be sure, Welsh challenges both agreements in their entirety. *See* [8] at 5–6. And normally, a "choice-of-law provision has force only if the parties validly formed a contract." *Edminster, Hinshaw, Russ & Assocs., Inc. v. Downe Twp.*, 953 F.3d 348, 351 (5th Cir. 2020). But "the only issue properly before [the Court] is the validity of the arbitration clause itself, not the validity of the contract in its entirety." *Overstreet*, 462 F.3d at 411. So "at least for the purposes of [the Court's] analysis, the validity of the [Nebraska and California] choice of law provision[s] applicable to the parties' contract[s] has not been called into question." *Id.*

6

arbitration agreement if the making of the arbitration agreement is in issue." *Trammell v. AccentCare, Inc.*, 776 F. App'x 208, 210 (5th Cir. 2019) (per curiam) (citation modified); *accord* § 4. Since the Court finds that Welsh has placed in issue whether an arbitration agreement exists, it will set the matter for a bench trial. *See Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992).

When a party disputes an arbitration agreement's validity, it first bears the burden of showing its entitlement to a trial. *Id.*; *see also Trammell*, 776 F. App'x at 209–10; *Chester*, 607 F. App'x at 363–64, 364 n.4. Meeting this burden requires "some showing that under [the] prevailing [state] law, [the party] would be relieved of [its] contractual obligation to arbitrate if [its] allegations proved to be true." *Dillard*, 961 F.2d at 1154. So "[t]o put the making of the arbitration agreement 'in issue,'" the party must "'unequivocally deny' that [it] agreed to arbitrate and produce 'some evidence' supporting [its] position." *Chester*, 607 F. App'x at 363–64 (alterations incorporated) (quoting *T & R Enters., Inc. v. Cont'l Grain Co.*, 613 F.2d 1272, 1278 (5th Cir. 1980)). *But see Am. Heritage Life Ins. v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002) (rejecting "hollow, bald assertions" in "self-serving affidavits").[2]

---

[2] At least one published Fifth Circuit case has suggested that the party seeking arbitration must first "show that the agreement meets all of the requisite contract elements" before the resisting party must "produce *some* contrary evidence to put the matter 'in issue.'" *Yanez*, 140 F.4th at 630 (first quoting *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018); and then quoting *Gallagher v. Vokey*, 860 F. App'x 354, 357–58 (5th Cir. 2021) (per curiam)). It appears that *Yanez* relied on *Huckaba*, which applied procedural standards drawn from state law. *See id.* (applying Texas's evidentiary standard); *Huckaba*, 892 F.3d at 688 (applying Texas's burden-shifting framework); *see also, e.g., Seifert*, 684 F. Supp. 3d at 564. But *Chester* looked to the federal procedural

7

If the party resisting arbitration places the arbitration agreement's existence in issue, then the court must "summarily proceed to a trial on this issue." *Chester*, 607 F. App'x at 365 (citing § 4). At trial, the party seeking arbitration must then "prove the existence of an agreement to arbitrate by a preponderance of the evidence." *Id.* at 364 (citing *Banks v. Mitsubishi Motors Credit of Am., Inc.*, 435 F.3d 538, 540 (5th Cir. 2005) (per curiam)); *see also Coon v. Crawford & Co.*, No. 3:23-CV-2732, 2024 WL 2804931, at *3 n.3 (N.D. Tex. May 30, 2024).

Substantively speaking, Nebraska and California contract law agree that forgery prevents contract formation. Both states require mutual assent and consideration for contract formation. *E.g.*, *Bruce Lavalleur, P.C. v. Guarantee Grp., L.L.C.*, 992 N.W.2d 736, 742 (Neb. 2023); *accord Aton Ctr., Inc. v. United Healthcare Ins.*, 311 Cal. Rptr. 3d 564, 581 (Ct. App. 2023) (citing Cal. Civ. Code § 1550). And both recognize that forgery renders the apparent contract void for lack of mutual assent. *See, e.g.*, *Dunbier v. Rafert*, 103 N.W.2d 814, 829 (Neb. 1960); *Sack v. Siekman*, 23 N.W.2d 706, 708, 714 (Neb. 1946); *accord St. Agnes Med. Ctr.*

---

standard stated in *T & R Enterprises* and reaffirmed in *Dillard*. *See Chester*, 607 F. App'x at 363–64 (citing *T & R Enters.*, 613 F.2d at 1278); *Dillard*, 961 F.2d at 1154; *see also Soni v. Solera Holdings, L.L.C.*, No. 21-10428, 2022 WL 1402046, at *3 (5th Cir. May 4, 2022) (per curiam).

While the Eleventh Circuit has rejected the *T & R Enterprises* standard in favor of state-law standards, *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329–30 (11th Cir. 2016), the Fifth Circuit never has. *See, e.g.*, *Soni*, 2022 WL 1402046, at *3. Without question, courts evaluate an arbitration agreement's validity using substantive state contract law. *See Yanez*, 140 F.4th at 630. But the Court doubts whether "state law should inform who bears the burden . . . ." *Soni*, 2022 WL 1402046, at *3. So to the extent that *Yanez* conflicts with *T & R Enterprises* and *Dillard*, the Court applies the *T & R Enterprises* standard. *See Nivelo Cardenas v. Garland*, 70 F.4th 232, 242 n.7 (5th Cir. 2023) ("To the extent two panel decisions conflict, the earlier decision controls.").

*v. PacifiCare of Cal.*, 82 P.3d 727, 735–36 (Cal. 2003), *overruled on other grounds by*, *Quach v. Cal. Com. Club, Inc.*, 551 P.3d 1123 (Cal. 2024); *Bruni v. Didion*, 73 Cal. Rptr. 3d 395, 406, 408 (Ct. App. 2008).

Since forgery voids a contract under Nebraska and California law, the Court considers Welsh's challenges to the arbitration provisions together. Welsh has denied that Green entered into either agreement. [7-1] ¶¶ 10–11. And she has produced some evidence suggesting that Green did not sign the agreements. *See id.* ¶¶ 7–9, 13; [5-1] at 6, 24. First, Welsh asserts in her [7-1] Affidavit that Green never owned a computer or smartphone and never learned how to use one. [7-1] ¶ 8. Second, Welsh states that Green did not have the mental faculties at ages 85 or 87—when the agreements were signed—to open the brokerage accounts online. *Id.* ¶ 9; [8] at 3. Third, she notes that the agreements bear Nuzum's email address and an out-of-state phone number, even though Green lived in Mississippi and preferred using a landline for phone calls. [8] at 3–5; [7-1] ¶¶ 1, 3, 8. And fourth, Welsh alleges that Green gave her a power of attorney in 2015 but never disclosed either account. *See* [7-1] ¶¶ 7, 13. As a result, Welsh concludes that Nuzum forged Green's electronic signature on the agreements. *Id.* ¶¶ 11–12.

For its part, Schwab contends that Welsh's [7-1] Affidavit is speculative and fails to lay a foundation for Welsh's personal knowledge. [10] at 2. The Court disagrees. While Welsh does not have personal knowledge that Nuzum forged Green's electronic signature, her conclusion is rationally based on her perception of Green's technical capabilities and the agreements bearing Nuzum's email address.

9

*See* Fed. R. Evid. 701. Additionally, Welsh's [7-1] Affidavit need not lay a perfect foundation for her opinion so long as it shows that the opinion can be admitted at trial. *Cf. In re Deepwater Horizon*, 48 F.4th 378, 384–85 (5th Cir. 2022).

To that end, the [7-1] Affidavit establishes Welsh's familiarity with Green's technical capabilities and mental faculties. *See* [7-1] ¶¶ 2–3. It alleges that Welsh assumed primary responsibility for Green's care in 2004 because Green's other children lived out of state. *Id.* ¶ 2. And in 2016, Green moved into an assisted living home, where Welsh visited her several times per week until Green died in 2024. *Id.* ¶ 3; [1] ¶¶ 6, 12. These facts indicate Welsh's familiarity with Green's analog lifestyle and limited technical capabilities. Because Nuzum's email address appears on the electronically generated agreements, these facts permit an inference that Green did not sign the agreements.

Moreover, Welsh's [7-1] Affidavit provides more than "hollow, bald assertions." *Orr*, 294 F.3d at 710. She "explains why [s]he is convinced that [Green] did not sign the arbitration agreement." *Chester*, 607 F. App'x at 364 n.4. And "there is some corroborating evidence that [Green] did not sign the agreement . . . ." *Id.* Specifically, both agreements listed "RWNUZUM@COMCAST.NET" and "(504) 722-7863" as Green's contact information. [5-1] at 6, 24. But the email address bears Nuzum's name, and the phone number bears a Louisiana area code,[3] despite

---

[3] *Area Code Query*, North American Numbering Plan Administrator, https://secure.nanpa.com/public-report/npa/search-area-codes/section/query [https://perma.cc/6Y7V-GC9C] (last visited July 26, 2025) (enter "504" in the search bar). The Court takes judicial notice that area code 504 covers part of Louisiana. *See* Fed. R. Evid. 201; *see also, e.g., Hicks v. Hous. Baptist Univ.*, No. 5:17-CV-629, 2019 WL 96219, at *4 & n.5 (E.D.N.C. Jan. 3, 2019) (taking judicial notice of geographic area code assignment).

10

Green's residence in Mississippi and preference for landlines. *See id.*; [7-1] ¶¶ 1, 3, 8.

Considering the facts in the record, Welsh has put in issue whether Green—having a lifelong aversion to computers and a preference for landlines—opened her first online brokerage account at age 85 using her son's email address and an out-of-state phone number. The same holds true about whether Green, at age 87, opened a second online brokerage account without telling her daughter, whom she had appointed as her attorney-in-fact just a year before. As a result, the Court will set this matter for a bench trial on whether an arbitration agreement exists. *See Chester*, 607 F. App'x at 365 & n.5.

IV.   Conclusion

For the reasons stated above, the Court DENIES WITHOUT PREJUDICE Schwab's [5] Motion to Compel Arbitration. In doing so, the Court has considered all the arguments raised. Those arguments not addressed would not have altered the Court's decision. The Court will set a bench trial on whether an arbitration agreement exists. The Courtroom Deputy will contact the parties to arrange a trial setting.

SO ORDERED, this 29th day of August, 2025.

s/ *Kristi H. Johnson*<br>UNITED STATES DISTRICT JUDGE